THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* DONALD FRIEDE and Another, Defendants.

Magistrates' Court, City of New York, Borough of Manhattan, Seventh District, February 21, 1929.

Joab H. Banton, District Attorney [Felix G. Benvenga and Saul Price of counsel], for the People.

Greenbaum, Wolff & Ernst [Morris L. Ernst, Newman Levy and Alexander Lindey of counsel], for the defendants.

BUSHEL, City Magistrate. The defendants are charged with having violated section 1141 of the Penal Law by their possession and sale of a book entitled " The Well of Loneliness." Evidence proving possession and sale of the book by the defendants had been introduced and is not controverted by them. The defendants maintain, however, that such possession and sale did not offend against the provisions of the law, and have moved to dismiss the complaint.

Section 1141 of the Penal Law provides: " A person who sells * * * or has in his possession with intent to sell, * * * any obscene, lewd, lascivious, filthy, indecent or disgusting book * * * is guilty of a misdemeanor." The defendants contend that as a matter of law " The Well of Loneliness " is not obscene, lewd, lascivious, filthy or disgusting within the meaning of the statute; that if any jury held otherwise it would be incumbent upon the court to set aside the verdict, and accordingly that the complaint should be dismissed.

This court in a prosecution of this character is not the trier of the fact. Its judicial province is limited to a determination of the question as to whether as matter of law it can be said that the book which forms the basis of the charge in question is not violative of the statute. The evidence before me, however, is the same as that which would be presented to the tribunal vested with the power of deciding the facts as well as the law.

The book here involved is a novel dealing with the childhood and early womanhood of a female invert. In broad outline the story shows how these unnatural tendencies manifested themselves from early childhood; the queer attraction of the child to the maid in the household; her affairs with one Angela Crossby, a normally sexed, but unhappily married woman, causing further dissension between the latter and her husband; her jealousy of another man who later debauched this married woman, and her despair, in being supplanted by him in Angela's affections, are vividly portrayed. The book culminates with an extended elaboration upon her intimate relations with a normal young girl, who becomes a helpless subject of her perverted influence and passion, and pictures the struggle for this girl's affections between this invert and a man from whose normal advances she herself had previously recoiled, because of her own perverted nature. Her sex experiences are set forth in some

detail and also her visits to various resorts frequented by male and female inverts.

The author has treated these incidents not without some restraint; nor is it disputed that the book has literary merit. To quote the People's brief: " It is a well-written, carefully constructed piece of fiction," and " contains no unclean words." Yet the narrative does not veer from its central theme, and the emotional and literary setting in which they are found give the incidents described therein great force and poignancy. The unnatural and depraved relationships portrayed are sought to be idealized and extolled. The characters in the book who indulge in these vices are described in attractive terms, and it is maintained throughout that they be accepted on the same plane as persons normally constituted, and that their perverse and inverted love is as worthy as the affection between normal beings and should be considered just as sacred by society.

The book can have no moral value since it seeks to justify the right of a pervert to prey upon normal members of a community and to uphold such relationship as noble and lofty. Although it pleads for tolerance on the part of society of those possessed of and inflicted with perverted traits and tendencies, it does not argue for repression or moderation of insidious impulses. An idea of the moral tone which the book assumes may be gained from the attitude taken by its principal character towards her mother, pictured as a hard, cruel and pitiless woman because of the abhorrence she displays to unnatural lust and to whom, because of that reaction, the former says: " But what I will never forgive is your daring to try and make me ashamed of my love. I'm not ashamed of it, there's no shame in me."

The theme of the novel is not only anti-social and offensive to public morals and decency, but the method in which it is developed, in its highly emotional way attracting and focusing attention upon perverted ideas and unnatural vices and seeking to justify and idealize them, is strongly calculated to corrupt and debase those members of the community who would be susceptible to its immoral influence.

Although the book in evidence is prefaced by a laudatory commentary by Havelock Ellis, yet it is he who, in his scientific treatise on the subject, states: " We are bound to protect the helpless members of society against the invert." (Havelock Ellis, Studies in the Psychology of Sex, vol. 2, p. 356.) The court is charged with that precise duty here. The test of an obscene book laid down in *Regina* v. *Hicklin* (L. R. 3 Q. B. 360, 369), and quoted in *People* v. *Muller* (96 N. Y. 408, 411), is " whether the tendency of

the matter charged as obscenity is to deprave or corrupt those whose minds are open to such immoral influences, and who might come into contact with it." Although not sole and exclusive, this test is one which has been frequently applied. (*People* v. *Doris*, 14 App. Div. 117; *People* v. *Seltzer*, 122 Misc. 329; *People* v. *Zambounis*, 225 App. Div. 751. See, also, dissenting opinions of CRANE, J., in *Halsey* v. *N. Y. Society*, 234 N. Y. 1, 7, and of DOWLING, J., in *People* v. *Brainard*, 192 App. Div. 816, 822.) It may be accepted as a basis for judicial decision here.

Its application and soundness are assailed by learned counsel for the defendants, who argue that it seeks to gauge the mental and moral capacity of the community by that of its dullest-witted and most fallible members. This contention overlooks the fact that those who are subject to perverted influences and in whom that abnormality may be called into activity and who might be aroused to lustful and lecherous practices, are not limited to the young and immature, the moron, the mentally weak, or the intellectually impoverished, but may be found among those of mature age and of high intellectual development and professional attainment.

Men may differ in their conceptions as to the propriety of placing any restrictions upon a literary work or absolute freedom of expression and interchange of ideas. This conflict between liberty and restraint is not new to the law. (Paradoxes of Legal Science, Hon. BENJAMIN N. CARDOZO.) However, the Legislature has spoken on that subject in the enactment of the statute in question. Even if the courts were not (as a matter of fact they are) in accord with the public policy it declares, they would not be free to disregard it because it may be founded upon conceptions of morality with which they disagree. Moreover, the Legislature has not sought to set up a literary censorship or attempted to confine thought and discussion in a straight-jacket of inflexible legal definition, but has imposed upon the courts the duty of protecting the weaker members of society from corrupt, depraving and lecherous influences although exerted through the guise and medium of literature, drama or art. The public policy so declared was reaffirmed by the Legislature by its recent amendment to the Penal Law, making it a misdemeanor to prepare, advertise or present any drama, play, etc., dealing with the subject of sex degeneracy or sex perversion. (Laws of 1927, chap. 690.)

Defendants' counsel urge that the book is to be judged by the *mores* of the day. The community, through this recent legislation, has evinced a public policy even more hostile to the presentation and circulation of matter treating of sexual depravity. The

argument, therefore, that the *mores* have so changed as to fully justify the distribution of a book exalting sex perversion is without force. The amendment to the Penal Law just referred to followed closely upon the decision of the Appellate Division of this department in *Liveright* v. *Waldorf Theatres Corporation* (220 App. Div. 182), which involved a dramatization of the same theme as this novel. In the language there employed by McAvoy, J., " it cannot be said dogmatically that the morals of youth, or even of adults, would not be affected by presenting a theme of the character here exhibited," and that it might not " give to some minds a lecherous swing causing a corruption of the moral tone of the susceptible members " of the community.

The defendants' brief refers the court to eminent men of letters, critics, artists and publishers who have praised " The Well of Loneliness." Were the issue before the court the book's value from a literary standpoint the opinions of those mentioned might, of course, carry great weight. However, the book's literary merits are not challenged, and the court may not conjecture as to the loss that its condemnation may entail to our general literature, when it is plainly subversive of public morals and public decency, which the statute is designed to safeguard. Moreover, it has been held that the opinions of experts are inadmissible. (*People* v. *Muller, supra; People* v. *Seltzer, supra.*) And as Mr. Justice WAGNER (*People* v. *Seltzer, supra*) said, in disposing of a similar situation: " Charm of language, subtilty of thought, faultless style, even distinction of authorship, may all have their lure for the literary critic, yet these qualities may all be present and the book be unfit for dissemination to the reading public. Frequently these attractive literary qualities are the very vehicles by which the destination of illegality is reached."

The learned justice, in the same opinion, then summarizes, as follows, " the general, though not exclusive, rules as aids to interpretation: The penal provision prohibits the publication of lewd, lascivious, salacious or obscene writings the tendency of which is to excite lustful and lecherous desires; likewise it prohibits the publication of those writings whose tendency is to deprave or corrupt minds open to immoral influences and who might come in contact with it. It is also offensive to the section if the matters charged as obscene are so filthy and disgusting as to be revolting to those who may have occasion to read them."

I am convinced that " The Well of Loneliness " tends to debauch public morals, that its subject-matter is offensive to public decency, and that it is calculated to deprave and corrupt minds open to its immoral influences and who might come in contact with it, and

applying the rules and recognized standards of interpretation as laid down by our courts, I refuse to hold as matter of law that the book in question is not violative of the statute. Accordingly, and under the stipulation entered into in this case, that the testimony taken upon the summons shall be the testimony taken upon the complaint if one is ordered, I hereby order a complaint against these defendants. The motion to dismiss the complaint is denied, and the defendants are held for the action of the Court of Special Sessions.